# ADJUSTABLE RATE NOTE

(LIBOR Index - Rate Caps)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

| | | |
|---|---|---|
| SEPTEMBER 30, 2004 | DALLAS | TEXAS |
| [Date] | [City] | [State] |

3319 OAK RUN LANE, MANSFIELD, TEXAS 76063
[Property Address]

**1. BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $ 216,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is FIRST BANK D/B/A FIRST BANK MORTGAGE. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2. INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 6.9900%. The interest rate I will pay may change in accordance with Section 4 of this Note.

The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay principal and interest by making a payment every month.

I will make my monthly payments on the 1ST day of each month beginning on NOVEMBER 01, 2004. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on OCTOBER 01, 2034, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 1 FIRST MISSOURI CENTER, ST. LOUIS, MO 63141 or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments will be in the amount of U.S. $ 1,258.20. This amount may change.

**(C) Monthly Payment Changes**

Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

FIRST LIEN [redacted]



EXHIBIT A

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(A) Change Dates**

The interest rate I will pay may change on the 1ST day of OCTOBER , 2006 , and on that day every 6TH month thereafter. Each date on which my interest rate could change is called a "Change Date."

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal.* The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE & 99/100 percentage points ( 5.9900 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the Maturity Date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 7.9900% or less than 6.9900 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE percentage point(s) ( 1.0000 %) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.9900 %. My interest rate will never be less than 6.9900 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**5. BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

**6. LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

FIRST LIEN



EXHIBIT A

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0000 % of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

FIRST LIEN



EXHIBIT A

**Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

SEE INTEREST ONLY ADDENDUM, NON-ASSUMABLE ADDENDUM & PREPAYMENT ADDENDUM ATTACHED HERETO AND MADE A PART HEREOF.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

| | |
|---|---|
| _______________ (Seal) -Borrower<br>SONDREA LYDIA CAMPBELL | _______________ (Seal) -Borrower |
| _______________ (Seal) -Borrower | _______________ (Seal) -Borrower |
| _______________ (Seal) -Borrower | _______________ (Seal) -Borrower |
| _______________ (Seal) -Borrower | _______________ (Seal) -Borrower |

*[Sign Original Only]*

FIRST LIEN [redacted]



EXHIBIT A

PAY TO THE ORDER OF

WITHOUT RECOURSE
FIRST BANK DBA FIRST BANK MORTGAGE

By: Craig Ahrens, Executive Vice President

EXHIBIT A

**INTEREST-ONLY ADDENDUM**
**TO ADJUSTABLE RATE PROMISSORY NOTE**

Loan Number: [redacted]
Property Address: 3319 Oak Run Lane, Mansfield, TX 76063

**THIS ADDENDUM** is made this 30th day of September, 2004 and is incorporated into and intended to form a part of the Adjustable Rate Note (the "Note") dated the same date as the Addendum executed by the undersigned and payable to

First Bank d/b/a First Bank Mortgage

(the Lender).

**THIS ADDENDUM** supersedes Section 3(A), 3(B), 4(C) and 7 (A) of the Note. None of the other provisions of the Note are changed by this Addendum.

**3. PAYMENTS**

**(A) Time and Place of Payments**

I will pay interest by making payments every month for the first 60 payments (the "interest-only period") in the amount sufficient to pay interest as it accrues on the unpaid principal balance. I will pay principal and interest by making payments every month thereafter for the next 300 payment(s) in an amount sufficient to fully repay the unpaid principal balance of the Note at the end of the interest-only period in substantially equal monthly payments..

I will make my monthly payments on the 1st day of each month beginning on November, 2004

I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its schedule due date and will be applied to interest before principal. If, on October 1, 2034, I still owe amounts under this Note, I will pay those amounts in full on that date which is called the "Maturity Date."

I will make my payments at

1 First Missouri Center, Saint Louis, MO 63141

or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payment**

Each of my initial monthly payments will be in the amount of U. S. $ 1,258.20. This payment amount is based on the original principal balance of the Note. This payment amount may change.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding 5.990% percentage point(s) ( 5.990 ) to the current index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.



App #: [redacted]
[redacted] / UniPrint # [redacted]

EXHIBIT A

During the interest-only period, the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest-only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.

At the end of the interest-only period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I will owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal payments until the next Change Date.

**7. BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the Full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.0 % of my overdue payment of interest for the first 60 payments, and 5.0 % of my overdue payment of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

DATED:

Sondrea Lydia Campbell



App #: [redacted]
[redacted] UniPrint # [redacted]

EXHIBIT A

# ADDENDUM TO ADJUSTABLE RATE NOTE

THIS ADDENDUM TO ADJUSTABLE RATE NOTE is made this 30TH day of SEPTEMBER ,2004 , and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Note (the "Note") of the same date given by the undersigned (the "Borrower") and made payable to the order of
FIRST BANK D/B/A FIRST BANK MORTGAGE .

Paragraph 11 of the Note is hereby restated in its entirety as follows:

**11. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

> If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.
>
> If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Addendum to Adjustable Rate Note.

| | |
|---|---|
| (Seal) -Borrower<br>SONDREA LYDIA CAMPBELL | (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |
| (Seal) -Borrower | (Seal) -Borrower |

*[Sign Original Only]*

JASSUMN (01/01) FIRST LIEN [redacted]

EXHIBIT A

# PREPAYMENT NOTE ADDENDUM

**(Multistate - Hard)**

**NOTICE TO BORROWER**
**Do not sign this loan agreement before you read it.**
**The loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.**

THIS PREPAYMENT NOTE ADDENDUM ("Addendum") is made this 30TH day of SEPTEMBER , 2004 , and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned ("Borrower") to
FIRST BANK D/B/A FIRST BANK MORTGAGE
("Lender") and dated the same date as this Addendum (the "Note").

ADDITIONAL COVENANTS: In addition to the covenants and agreements in the Note, Borrower and Lender further covenant and agree as follows:

A. PREPAYMENT CHARGE

Section 5 of the Note is deleted in its entirety and amended to read as follows:

5 . BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". A Prepayment of all of the unpaid principal is known as a "full prepayment". A Prepayment of only part of the unpaid principal is known as a "partial prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

**Except as provided below, I may make a full prepayment or a partial prepayment at any time without paying a Prepayment charge. If within a 2 YEAR period of the date of this Note ("Prepayment Period"), I make a full or partial Prepayment(s) of more than twenty percent (20%) of the original principal amount in a twelve month period, I will pay a prepayment charge. The prepayment charge will be in an amount equal to the payment of six (6) months' advance interest (at the rate in effect at the time the Prepayment occurs) on any Prepayment that, when added to all other amounts prepaid during the twelve month period immediately preceding the date of the Prepayment exceeds twenty percent (20%) of the original principal amount of the Note.**

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If my loan has an adjustable rate feature, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following a partial Prepayment. However, any reduction due to a partial Prepayment may be offset by an interest rate increase.

The Note Holder's failure to collect a Prepayment charge at the time a Prepayment is received shall not be deemed a waiver of such charge. Any Prepayment charge not collected at the time the Prepayment is received shall be due and payable on demand.

FIRST LIEN



EXHIBIT A

**B. INVALIDITY**

If a law, which applies to this loan and which sets a maximum Prepayment charge or prohibits Prepayment charges, is finally interpreted so that the Prepayment charge to be collected in connection with this loan exceeds the permitted limits, then (i) any such Prepayment charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, or (ii) if the Prepayment charge is prohibited, no Prepayment charge will be assessed or collected.

**C. CONTROLLING PROVISIONS**

To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note and/or the Security Instrument, the provisions of this Addendum shall prevail over and shall supersede any such inconsistent provisions of the Note and/or the Security Instrument. All other provisions of the Note and/or the Security Instrument shall be unchanged and remain in full force and effect.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Prepayment Note Addendum.

| | |
|---|---|
| _______________ (Seal)<br>SONDREA LYDIA CAMPBELL -Borrower | _______________ (Seal)<br>-Borrower |
| _______________ (Seal)<br>-Borrower | _______________ (Seal)<br>-Borrower |
| _______________ (Seal)<br>-Borrower | _______________ (Seal)<br>-Borrower |
| _______________ (Seal)<br>-Borrower | _______________ (Seal)<br>-Borrower |

*[Sign Original Only]*

FIRST LIEN [redacted]



EXHIBIT A

29

Return To:
FIRST BANK D/B/A FIRST BANK MORTGAGE

1370 SOUTH VALLEY VISTA DRIVE, #280
DIAMOND BAR, CA 91765

Prepared By:
DENNIS P. SCHWARTZ
SCHWARTZ & ASSOCIATES
1446 HERITAGE DRIVE
MCKINNEY, TEXAS 75069
972-562-1966

Merrill Lynch

[Space Above This Line For Recording Data]

# DEED OF TRUST

## NOTICE OF CONFIDENTIALITY RIGHTS:

**If you are a natural person, you may remove or strike any of the following information from this instrument before it is filed for record in the public records: your social security number or your driver's license number.**

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated SEPTEMBER 30, 2004 , together with all Riders to this document.
(B) "Borrower" is
SONDREA LYDIA CAMPBELL, A MARRIED PERSON

JOINED HEREIN BY EDWARD CAMPBELL

Borrower is the grantor under this Security Instrument.
(C) "Lender" is
FIRST BANK D/B/A FIRST BANK MORTGAGE

Lender is a CORPORATION
organized and existing under the laws of THE STATE OF MISSOURI .

[redacted]



E-C.

EXHIBIT A

Lender's address is
1370 SOUTH VALLEY VISTA DRIVE, #280, DIAMOND BAR, CA 91765 .
Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is
FIRST LAND TRUSTEE CORPORATION .
Trustee's address is
11901 OLIVE BOULEVARD, CREVE COEUR, MO 63141 .
**(E) "Note"** means the promissory note signed by Borrower and dated SEPTEMBER 30, 2004 .
The Note states that Borrower owes Lender
TWO HUNDRED SIXTEEN THOUSAND AND 00/100 Dollars
(U.S. $216,000.00 ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than OCTOBER 01, 2034 .
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

[X] Adjustable Rate Rider [ ] Condominium Rider [ ] Second Home Rider
[ ] Balloon Rider [X] Planned Unit Development Rider [ ] 1-4 Family Rider
[ ] VA Rider [ ] Biweekly Payment Rider
[X] Other(s) [specify] RIDER TO ADJUSTABLE RATE RIDER & INTEREST ONLY RIDER

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard

Initials: [redacted]



E.C.

EXHIBIT A

to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of TARRANT :

[Name of Recording Jurisdiction]

BEING LOT 10, BLOCK 1 OF OAK RUN ESTATES, AN ADDITION TO THE CITY OF MANSFIELD, TARRANT COUNTY, TEXAS, ACCORDING TO THE PLAT THEREOF RECORDED IN CABINET A, SLIDE 5728, PLAT RECORDS, TARRANT COUNTY, TEXAS.

Parcel ID Number:
07591667

which currently has the address of

3319 OAK RUN LANE [Street]
MANSFIELD [City], Texas 76063 [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. [redacted]

Initials: ____



E.C.

EXHIBIT A

currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

Initials: [redacted]



E.C.

EXHIBIT A

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the



E.C.

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

[redacted]



E.C.

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

Initials: [redacted]

E.C.



EXHIBIT A

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

[redacted]



E.C.

EXHIBIT A

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

Initials: [redacted]

E.C.



EXHIBIT A

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

Initials: [redacted]

E.C.



EXHIBIT A

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

Initials: [redacted]

E.C.



EXHIBIT A

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: [redacted]



EXHIBIT A

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice will result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence. For the purposes of this Section 22, the term "Lender" includes any holder of the Note who is entitled to receive payments under the Note.**

**If Lender invokes the power of sale, Lender or Trustee shall give notice of the time, place and terms of sale by posting and filing the notice at least 21 days prior to sale as provided by Applicable Law. Lender shall mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale shall be made at public venue. The sale must begin at the time stated in the notice of sale or not later than three hours after that time and between the hours of 10 a.m. and 4 p.m. on the first Tuesday of the month. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.**

**Trustee shall deliver to the purchaser Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**If the Property is sold pursuant to this Section 22, Borrower or any person holding possession of the Property through Borrower shall immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person shall be a tenant at sufferance and may be removed by writ of possession or other court proceeding.**

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Substitute Trustee; Trustee Liability.** All rights, remedies and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender, at its option and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee shall become vested with the title, rights, remedies, powers and duties conferred upon Trustee herein and by Applicable Law.

Initials: [redacted]



EXHIBIT A

Trustee shall not be liable if acting upon any notice, request, consent, demand, statement or other document believed by Trustee to be correct. Trustee shall not be liable for any act or omission unless such act or omission is willful.

**25. Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender shall be subrogated to any and all rights, superior titles, liens and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder thereof upon payment.

**26. Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured hereby, payments in reduction of such sums shall be applied first to those portions not secured hereby.

**27. Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property. Check box as applicable:**

[X] **Purchase Money.**
The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

[ ] **Owelty of Partition.**
The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

[ ] **Renewal and Extension of Liens Against Homestead Property.**
The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

[ ] **Acknowledgment of Cash Advanced Against Non-Homestead Property.**
The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

**28. Loan Not a Home Equity Loan. The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 28.**

Initials: [redacted]



E.C.

EXHIBIT A

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_________________________ (Seal)
SONDREA LYDIA CAMPBELL -Borrower

_________________________ (Seal)
EDWARD CAMPBELL -Borrower

_________________________ (Seal) -Borrower

_________________________ (Seal) -Borrower

_________________________ (Seal) -Borrower

_________________________ (Seal) -Borrower

_________________________ (Seal) -Borrower

_________________________ (Seal) -Borrower

[redacted]



EXHIBIT A

STATE OF TEXAS
County of DALLAS

Before me Amy P. Fryar on this day personally appeared
SONDREA LYDIA CAMPBELL AND EDWARD CAMPBELL

known to me (or proved to me on the oath of ______
or through TEXAS ______ ) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she/they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 30 day of SEPTEMBER, 2004.

(Seal)

AMY PAULETTE FRYAR
NOTARY PUBLIC
STATE OF TEXAS
EXPIRES
03-19-2008

______
Notary Public

My Commission Expires: ______

[redacted]

Initials: SC
E.C.

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 30TH day of SEPTEMBER, 2004, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to FIRST BANK D/B/A FIRST BANK MORTGAGE

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

3319 OAK RUN LANE, MANSFIELD, TEXAS 76063
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in VOLUME 14863, PAGE 408, DEED RECORDS, TARRANT COUNTY, TEXAS AND AS AMENDED
(the "Declaration"). The Property is a part of a planned unit development known as

OAK RUN ESTATES
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

[redacted]



EXHIBIT A

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

[redacted]



E. C.

EXHIBIT A

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

| | |
|---|---|
| _______________ (Seal)<br>SONDREA LYDIA CAMPBELL -Borrower | _______________ (Seal)<br>EDWARD CAMPBELL -Borrower |
| _______________ (Seal)<br>-Borrower | _______________ (Seal)<br>-Borrower |
| _______________ (Seal)<br>-Borrower | _______________ (Seal)<br>-Borrower |
| _______________ (Seal)<br>-Borrower | _______________ (Seal)<br>-Borrower |

[redacted]



Return To:
FIRST BANK D/B/A FIRST BANK MORTGAGE

1370 SOUTH VALLEY VISTA DRIVE, #280
DIAMOND BAR, CA 91765

EXHIBIT A

# ADJUSTABLE RATE RIDER
**(LIBOR Index - Rate Caps)**

THIS ADJUSTABLE RATE RIDER is made this 30TH day of SEPTEMBER , 2004 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Deed to Secure Debt (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Note to
FIRST BANK D/B/A FIRST BANK MORTGAGE

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

3319 OAK RUN LANE, MANSFIELD, TEXAS 76063
[Property Address]

**THE NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN THE INTEREST RATE AND THE MONTHLY PAYMENT. THE NOTE LIMITS THE AMOUNT THE BORROWER'S INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE THE BORROWER MUST PAY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
The Note provides for an initial interest rate of 6.9900 %. The Note provides for changes in the interest rate and the monthly payments, as follows:

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**
**(A) Change Dates**
The interest rate I will pay may change on the 1ST day of OCTOBER , 2006 , and on that day every 6TH month thereafter. Each date on which my interest rate could change is called a "Change Date."

[redacted]


Initials: JC
E.C.

EXHIBIT A

**(B) The Index**

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the first business day of the month immediately preceding the month in which the Change Date occurs is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding FIVE & 99/100 percentage points ( 5.9900%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment that would be sufficient to repay the unpaid principal that I am expected to owe at the Change Date in full on the maturity date at my new interest rate in substantially equal payments. The result of this calculation will be the new amount of my monthly payment.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 7.9900 % or less than 6.9900 %. Thereafter, my interest rate will never be increased or decreased on any single Change Date by more than ONE percentage point(s) ( 1.0000%) from the rate of interest I have been paying for the preceding 6 months. My interest rate will never be greater than 12.9900 %. My interest rate will never be less than 6.9900 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

[redacted]

Initials: [signature] E.C.



EXHIBIT A

**(F) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in my interest rate and the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

> **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.
>
> If all or any part of the Property or any Interest in the Property is sold or transferred (or if a Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.
>
> To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.
>
> If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

Initials SC [redacted]



E.C.

EXHIBIT A

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____ (Seal) -Borrower
SONDREA LYDIA CAMPBELL

_____ (Seal) -Borrower
EDWARD CAMPBELL

_____ (Seal) -Borrower

_____ (Seal) -Borrower

_____ (Seal) -Borrower

_____ (Seal) -Borrower

_____ (Seal) -Borrower

_____ (Seal) -Borrower

[redacted]



Return To:
FIRST BANK D/B/A FIRST BANK MORTGAGE

1370 SOUTH VALLEY VISTA DRIVE, #280
DIAMOND BAR, CA 91765

# PREPAYMENT RIDER
## (Multistate - Hard)

**NOTICE TO BORROWER**
**Do not sign this loan agreement before you read it.**
**The loan agreement provides for the payment of a penalty if you wish to repay the loan prior to the date provided for repayment in the loan agreement.**

THIS PREPAYMENT RIDER ("Rider") is made this 30TH day of SEPTEMBER, 2004, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed ("Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Note to
FIRST BANK D/B/A FIRST BANK MORTGAGE

("Lender") of the same date and covering the Property described in the Security Instrument and located at:

3319 OAK RUN LANE, MANSFIELD, TEXAS 76063
[Property Address]

**ADDITIONAL COVENANTS:** In addition to the covenants and agreements in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PREPAYMENT CHARGE**
The Note provides for a Prepayment charge as follows:

**5 . BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". A Prepayment of all of the unpaid principal is known as a "full prepayment". A Prepayment of only part of the unpaid principal is known as a "partial prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

**Except as provided below, I may make a full prepayment or a partial prepayment at any time without paying a Prepayment charge. If within a 2 YEAR period of the date of this Note ("Prepayment Period"), I make a full or partial Prepayment(s) of more than twenty percent (20%) of the original principal amount in a twelve month period, I will pay a prepayment charge. The prepayment charge will be in an amount equal to the payment of six (6) months' advance interest (at the rate in effect at the time the Prepayment**



Initials: [redacted]

E.C.

EXHIBIT A

**occurs) on any Prepayment that, when added to all other amounts prepaid during the twelve month period immediately preceding the date of the Prepayment exceeds twenty percent (20%) of the original principal amount of the Note.**

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If my loan has an adjustable rate feature, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following a partial Prepayment. However, any reduction due to a partial Prepayment may be offset by an interest rate increase.

The Note Holder's failure to collect a Prepayment charge at the time a Prepayment is received shall not be deemed a waiver of such charge. Any Prepayment charge not collected at the time the Prepayment is received shall be due and payable on demand.

**B. INVALIDITY**

If a law, which applies to this loan and which sets a maximum Prepayment charge or prohibits Prepayment charges, is finally interpreted so that the Prepayment charge to be collected in connection with this loan exceeds the permitted limits, then (i) any such Prepayment charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, or (ii) if the Prepayment charge is prohibited, no Prepayment charge will be assessed or collected.

**C. CONTROLLING PROVISIONS**

To the extent that the provisions of this Rider are inconsistent with the provisions of the Security Instrument and/or the Note, the provisions of this Rider shall prevail over and shall supersede any such inconsistent provisions of the Security Instrument and/or the Note. All other provisions of the Security Instrument and/or the Note shall be unchanged and remain in full force and effect.

 Initials: [redacted]

E.C -

EXHIBIT A

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this Prepayment Rider.

| | |
|---|---|
| _______ (Seal) -Borrower SONDREA LYDIA CAMPBELL | _______ (Seal) -Borrower EDWARD CAMPBELL |
| _______ (Seal) -Borrower | _______ (Seal) -Borrower |
| _______ (Seal) -Borrower | _______ (Seal) -Borrower |
| _______ (Seal) -Borrower | _______ (Seal) -Borrower |

[redacted]



Return To:
FIRST BANK D/B/A FIRST BANK MORTGAGE

1370 SOUTH VALLEY VISTA DRIVE, #280
DIAMOND BAR, CA 91765

# RIDER TO ADJUSTABLE RATE RIDER

THIS RIDER TO ADJUSTABLE RATE RIDER is made this 30TH day of SEPTEMBER, 2004, and is incorporated into and shall be deemed to amend and supplement the Adjustable Rate Rider (the "Rider") of the same date, said Rider being incorporated into and deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date and given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to
FIRST BANK D/B/A FIRST BANK MORTGAGE

(the "Lender") of the same date and covering the property described in the Security Instrument and located at:

3319 OAK RUN LANE, MANSFIELD, TEXAS 76063
[Property Address]

Paragraph B of the Rider is hereby restated in its enterety as follows:

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**
Section 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

 Initials: [redacted]

E.C.

EXHIBIT A

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Rider to Adjustable Rate Rider.

_______________ (Seal) -Borrower
SONDREA LYDIA CAMPBELL

_______________ (Seal) -Borrower
EDWARD CAMPBELL

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

_______________ (Seal) -Borrower

[redacted]



Return To:
FIRST BANK D/B/A FIRST BANK MORTGAGE

1370 SOUTH VALLEY VISTA DRIVE, #280
DIAMOND BAR, CA 91765

EXHIBIT A

**INTEREST-ONLY ADDENDUM
TO ADJUSTABLE RATE RIDER**

Loan Number: [redacted]

Property Address: 3319 Oak Run Lane, Mansfield, TX 76063

**THIS ADDENDUM** is made this 30th day of September, 2004 and is incorporated into and intended to form a part of the Adjustable Rate Rider (the "Rider") dated the same date as the Addendum executed by the undersigned and payable to

First Bank d/b/a First Bank Mortgage

(the Lender).

**THIS ADDENDUM** supersedes Section 4(C) of the Rider. None of the other provisions of the Note are changed by this Addendum.

**4. INTEREST RATE AND MONTHLY PAYMENT CHANGES**

**(C)Calculations of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding 5.990% Percentage point(s) ( 5.990 ) to the Current Index for such Change Date. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D), this rounded amount will be my new interest rate until the next Change Date.

During first five (5) years after loan closing ("interest-only period"), the Note Holder will determine the amount of the monthly payment that would be sufficient to pay accrued interest on the unpaid principal balance. This will be the amount of my monthly payment until the earlier of the next Change Date or the end of the interest-only period unless I make a voluntary prepayment of principal during such period. If I make a voluntary prepayment of principal during the interest-only period, my payment amount for subsequent payments will be reduced to the amount necessary to pay interest at the then current interest rate on the lower unpaid principal balance.

At the end of the interest-only period and on each Change Date thereafter, the Note Holder will determine the amount of the monthly payment that would be sufficient to repay in full the unpaid principal balance that I am expected to owe in substantially equal monthly payments over the remaining term of the Note. The result of this calculation will be the new amount of my monthly payment. After the end of the interest-only period, my payment amount will not be adjusted due to voluntary principal payments.

DATED:

[signature]
Sondrea Lydia Campbell

04/02 Form 45

App #: [redacted]
[redacted] / UniPrint # [redacted]

EXHIBIT A

FIRST BANK
1370 S VALLEY VISTA DR
#280
DIAMOND BAR CA 91765

Submitter: AMERICAN TITLE COMPANY/MESQUITE - ZAMEM - 0

---

SUZANNE HENDERSON
TARRANT COUNTY CLERK
TARRANT COUNTY COURTHOUSE
100 WEST WEATHERFORD
FORT WORTH, TX 76196-0401

***DO NOT DESTROY***
***WARNING - THIS IS PART OF THE OFFICIAL RECORD.***

Filed For Registration: 10/07/2004 04:25 PM
Instrument #: D204314746
DT 30 PGS $70.00

By: ______________________

[redacted]

D204314746

ANY PROVISION WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

EXHIBIT A

X

# WARRANTY DEED

Effective Date: 4/21/2020

Grantor: **Edward Campbell**

Grantor's Mailing Address (including county):

**3319 Oak Run Lane**
**Arlington, Texas 76063, Tarrant County**

Grantor: **Will Delafayette Davis**

Grantor's Mailing Address (including county):

**2102 Belmont Park Drive**
**Arlington, Texas 76017, Tarrant County**

Grantor: **Nicholas Christopher Lydia**

Grantor's Mailing Address (including county):

**2102 Belmont Park Drive**
**Arlington, Texas 76017, Tarrant County**

Grantor: **Jermey Alexander Lydia**

Grantor's Mailing Address (including county):

**3319 Oak Run Lane**
**Arlington, Texas 76063, Tarrant County**

Grantee: **Will Delafayette Davis**

Grantee's Mailing Address (including county):

**2102 Belmont Park Drive**
**Arlington, Texas 76017, Tarrant County**

Consideration: **Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by Grantor.**



EXHIBIT B

Property (including any improvements):

**Being Lot 10, Block 1 of Oak Run Estates, an Addition to the City of Mansfield, Tarrant County, Texas, according to the plat thereof recorded in Cabinet A, Slide 5728, Plat Records, Tarrant County, Texas.**

Grantor, for the consideration and subject to the reservations from and exceptions to conveyance and warranty, grants, sells, and conveys to Grantee the property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's heirs, executors, administrators, and successors to warrant and forever defend all and singular the property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the reservations from and exceptions to conveyance and warranty.

When the context requires, singular nouns and pronouns include the plural.

**EDWARD CAMPBELL**

**WILL DELAFAYETTE DAVIS**

**NICHOLAS CHRISTOPHER LYDIA**

**JERMEY ALEXANDER LYDIA**



EXHIBIT B

**(Acknowledgment)**

STATE OF TEXAS §
§
COUNTY OF TARRANT §

Before me, Herman Douglas Brown on this day personally appeared **EDWARD CAMPBELL**, known to me (or proved to me on the oath of ________________ or through Tx Identification to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 27th day of April, 2020.

Herman Douglas Brown
My Commission Expires
02/20/2022
ID No. 131456696

Notary Public
Notary's name (printed): Herman Douglas Brown
Notary's commission expires: 2/20/2022

STATE OF TEXAS §
§
COUNTY OF TARRANT §

Before me, Herman Douglas Brown on this day personally appeared **WILL DELAFAYETTE DAVIS**, known to me (or proved to me on the oath of________________ or through Tx Identification to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 27th day of April, 2020.

Herman Douglas Brown
My Commission Expires
02/20/2022
ID No. 131456696

Notary Public
Notary's name (printed): Herman Douglas Brown
Notary's commission expires: 2/20/2022



EXHIBIT B

STATE OF TEXAS §
§
COUNTY OF TARRANT §

Before me, Herman Douglas Brown on this day personally appeared **NICHOLAS CHRISTOPHER LYDIA**, known to me (or proved to me on the oath of________________ or through TX Identification to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 27th day of April, 2020.

Herman Douglas Brown
My Commission Expires
02/20/2022
ID No. 131458698

Notary Public
Notary's name (printed): Herman Douglas Brown
Notary's commission expires: 2/20/2022

STATE OF TEXAS §
§
COUNTY OF TARRANT §

Before me, Herman Douglas Brown on this day personally appeared **JERMEY ALEXANDER LYDIA**, known to me (or proved to me on the oath of________________ or through TX Identification to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 27th day of April, 2020.

Herman Douglas Brown
My Commission Expires
02/20/2022
ID No. 131458698

Notary Public
Notary's name (printed): Herman Douglas Brown
Notary's commission expires: 2/20/2022

AFTER RECORDING RETURN TO:

**Will Delafayette Davis**
**2102 Belmont Park Drive**
**Arlington, Texas 76017**



EXHIBIT B

MARY LOUISE NICHOLSON
COUNTY CLERK

100 West Weatherford Fort Worth, TX 76196-0401

PHONE (817) 884-1195

D2 MOTORS
1920 W PIONEER
ARLINGTON, TX 76015

Submitter: D2 MOTORS

***DO NOT DESTROY***
***WARNING - THIS IS PART OF THE OFFICIAL RECORD.***

| | | | | |
|---|---|---|---|---|
| Filed For Registration: | 5/22/2020 12:34 PM | | | |
| Instrument #: | D220116602 | | | |
| | WD | 5 | PGS | $31.00 |

By: Mary Louise Nicholson

D220116602

ANY PROVISION WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

EXHIBIT B

3

## AFFIDAVIT OF FACTS CONCERNING THE IDENTITY OF HEIRS

Before me, the undersigned authority, on this day personally appeared **Edward Campbell**, being first duly sworn, upon oath states:

1. My name is **Edward Campbell**, and my current residence is **3319 Oak Run Lane, Mansfield, Texas 76063**. I am personally familiar with the family and marital history of **Sondrea Renee Davis aka Sondrea Renee Campbell aka Sondrea Lydia Campbell** ("Decedent"), and I have personal knowledge of the facts stated in this affidavit.

2. I knew decedent for **27 years**. Decedent was my **wife**. Decedent died on **April 17, 2016**, at the age of 56. Decedent's place of death was **Medical Center of Arlington, Arlington, Texas**. At the time of decedent's death, decedent's residence was **3319 Oak Run Lane, Mansfield, Texas 76063**.

3. Decedent's marital history was as follows: at the time of her death, Decedent was married to Edward Campbell. Decedent was married twice in her lifetime. She divorced once. The circumstances of the marriage of the Decedent are as follows:

   a. Name of Spouse: Christopher Lydia
      Date of Marriage: 1980
      Date of Termination: 1989
      Place of Termination: Arlington, Tarrant County, Texas

   b. Name of Spouse: Edward Campbell
      Date of Marriage: October 16, 1991
      Date of Termination: April 17, 2016
      Place of Termination: Tarrant County (death of the decedent)

4. Decedent had the following children. One child was born of the marriage to Edward Campbell:



EXHIBIT B

a. Name: Will Delafayette Davis
Biological Father: Will Davis
Date of Birth: [redacted]1977
Current Address: 2102 Belmont Park Drive, Arlington, Texas 76017
Marital Status: Single

b. Name: Nicholas Christopher Lydia
Biological Father: Christopher Lydia
Date of Birth: [redacted]/1987
Current Address: 2102 Belmont Park Drive, Arlington, Texas 76017
Marital Status: Single

c. Name: Jermey Alexander Lydia
Biological Father: Edward Campbell
Date of Birth: [redacted]1992
Current Address: 3319 Oak Run Lane, Mansfield, Texas 76063
Marital Status: Single

5. Decedent did not have or adopt any other children and did not take any other children into decedent's home or raise any other children, except: **None**

6. The following persons have knowledge regarding the decedent, the identity of decedent's children, if any, parents, or siblings, if any:

a. Willie Nelloms
b. James M. Campbell

7. Decedent died without leaving a written will.

8. There has been no administration of decedent's estate.

9. Decedent left no debts that are unpaid, except:

None

10. There are no unpaid estate or inheritance taxes, except:

None

11. To the best of my knowledge, decedent owned an interest in the following real

**(Acknowledgment)**

STATE OF TEXAS §
§
COUNTY OF TARRANT §

Before me, Herman Douglas Brown on this day personally appeared **EDWARD CAMPBELL**, known to me (or proved to me on the oath of ________________ or through Texas Identification to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 27th day of April, 2020.

My Commission Expires 02/20/2022 Herman Douglas Brown ID No. 131458696

Notary Public
Notary's name (printed): Herman Douglas Brown
Notary's commission expires: 2/20/2022

STATE OF TEXAS §
§
COUNTY OF TARRANT §

Before me, Herman Douglas Brown on this day personally appeared **WILL DELAFAYETTE DAVIS**, known to me (or proved to me on the oath of ________________ or through Texas Identification to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this 27th day of April, 2020.

Notary Public
Notary's name (printed): Herman Douglas Brown
Notary's commission expires: 2/20/2022

Herman Douglas Brown
My Commission Expires
02/20/2022
ID No. 131458696



EXHIBIT B

MARY LOUISE NICHOLSON
COUNTY CLERK

100 West Weatherford Fort Worth, TX 76196-0401

PHONE (817) 884-1195

D2 MOTORS
1920 W PIONEER
ARLINGTON, TX 76015

Submitter: D2 MOTORS

## ***DO NOT DESTROY***
## ***WARNING - THIS IS PART OF THE OFFICIAL RECORD.***

| | | | | |
|---|---|---|---|---|
| Filed For Registration: | 5/22/2020 12:34 PM | | | |
| Instrument #: | D220116601 | | | |
| | AOH | 4 | PGS | $27.00 |

By: Mary Louise Nicholson

D220116601

ANY PROVISION WHICH RESTRICTS THE SALE, RENTAL OR USE OF THE DESCRIBED REAL PROPERTY BECAUSE OF COLOR OR RACE IS INVALID AND UNENFORCEABLE UNDER FEDERAL LAW.

EXHIBIT B

## Heirship Affidavit Questionnaire

Affiants must be over the age of eighteen years and otherwise competent to make this Affidavit. They must be familiar with the marital and familial history of Sondrea Davis Campbell, (hereinafter referred to as "Decedent"). Affiants have personal knowledge of all of the facts contained listed below and have no interest in the estate of Decedent

Decedent: Sondrea D. Campbell

Date of Birth: 3/27/1960
Place of Birth: Houston, Tx.

Date of Death: 4/17/2016
Place of Death: Arlington, Tx

Name of Spouse: Edward Campbell (successor)
Date of Marriage: 10/16/91
Married at time at death? ✓ yes _____ no

Any previous spouse(s): ✓ yes _____ no
If yes, please list names and dates of marriage(s), divorce(s), and death(s)
Christopher Lydia Marriage 1980 / Divorce 1989 Arlington, Tx.

Full legal names, birth dates, and addresses of children born to or adopted by decedent (If more than 3, please list information on another sheet of paper.):

Name: Will D. Davis (Delafayette) (Father) Will Davis
Birth Date: 11/10/77
Spouse: N
Current Address: 2102 Belmont Prk Dr. Arlington, Tx. 76017

Name: Nicholas C. Lydia (Christopher) (Father) Christopher Lydia
Birth Date: 08/23/87
Spouse: N
Current Address: 2102 Belmont Prk. Dr. Arlington, Tx. 76017

Name: Jermey A. Lydia (Alexander) (Father) Edward E. Campbell
Birth Date: 01/25/92
Spouse: N
Current Address: 3319 Oak Run Ln. Mansfield, Tx. 76063

Were any children taken into Decedent's home with the intent of adoption?
____ yes X no

1[ST] AFFIANT---MUST BE RELATED---DISINTERESTED PARTY

FULL LEGAL NAME: Willie Nelloms

EXHIBIT C

ADDRESS: [illegible] Arlington, Tx. [illegible]

PHONE NUMBER: 214-607-7799

LENGTH KNEW DECEDANT: 52 YEARS

RELATED TO DECEDANT? ✓ yes ______ no

HOW AFFIANT KNEW DECEDANT: Sister

**2nd AFFIANT**

FULL LEGAL NAME: Paula Echols

ADDRESS: 2368 Cable Ave Memphis, Tn. 38114

PHONE NUMBER: 901-830-9244

LENGTH KNEW DECEDANT: 56 YEARS

RELATED TO DECEDANT? ______ yes ✓ no

HOW AFFIANT KNEW DECEDANT: Sis n law

**3rd AFFIANT**

FULL LEGAL NAME: James M. Campbell

ADDRESS: 2369 Cable Ave. Memphis, Tn. 38114

PHONE NUMBER: 901-644-5177

LENGTH KNEW DECEDANT: 56 YEARS

RELATED TO DECEDANT? ______ yes ✓ no

HOW AFFIANT KNEW DECEDANT: sis-n-law

EXHIBIT C

STATE OF TEXAS
CERTIFICATION OF VITAL RECORD

# DEPARTMENT OF STATE HEALTH SERVICES
## VITAL STATISTICS UNIT

TEXAS DEPARTMENT OF STATE HEALTH SERVICES - VITAL STATISTICS
APR 25 2016

**STATE OF TEXAS** **CERTIFICATE OF DEATH** **STATE FILE NUMBER** [redacted]

TEXAS DEPARTMENT OF STATE HEALTH SERVICES - VITAL STATISTICS UNIT

| Field | Entry |
|---|---|
| 1. LEGAL NAME OF DECEASED (Include AKA's, if any) (First, Middle, Last) | SONDREA RENEE DAVIS AKA SONDREA RENEE CAMPBELL |
| (Maiden) | DAVIS |
| 2. DATE OF DEATH ACTUAL OR PRESUMED (mm-dd-yyyy) | APRIL 17, 2016 |
| 3. SEX | FEMALE |
| 4. DATE OF BIRTH (mm-dd-yyyy) | MARCH 27, 1960 |
| 5. AGE-Last Birthday (Years) | 56 |
| IF UNDER 1 YR (Mo / Days) | |
| IF UNDER 1 DAY (Hours / Min) | |
| 6. BIRTHPLACE (City & State or Foreign Country) | HOUSTON, TX |
| 7. SOCIAL SECURITY NUMBER | [redacted] |
| 8. MARITAL STATUS AT TIME OF DEATH | ☒ Married ☐ Widowed ☐ Divorced ☐ Never Married ☐ Unknown |
| 9. SURVIVING SPOUSE'S NAME (If wife, give name prior to first marriage) | ED CAMPBELL |
| 10a. RESIDENCE STREET ADDRESS | 3319 OAK RUN LN. |
| 10b. APT. NO. | |
| 10c. CITY OR TOWN | MANSFIELD |
| 10d. COUNTY | TARRANT |
| 10e. STATE | TEXAS |
| 10f. ZIP CODE | 76063 |
| 10g. INSIDE CITY LIMITS? | ☒ Yes ☐ No |
| 11. FATHER'S NAME PRIOR TO FIRST MARRIAGE | UNKNOWN UNKNOWN |
| 12. MOTHER'S NAME PRIOR TO FIRST MARRIAGE | BENNIE NELLOMS |
| 13. PLACE OF DEATH (CHECK ONLY ONE) — IF DEATH OCCURRED IN A HOSPITAL: | ☒ Inpatient ☐ ER/Outpatient ☐ DOA |
| IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: | ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify) |
| 14. COUNTY OF DEATH | TARRANT |
| 15. CITY/TOWN, ZIP (IF OUTSIDE CITY LIMITS, GIVE PRECINCT NO) | ARLINGTON, 76015 |
| 16. FACILITY NAME (If not institution, give street address) | MEDICAL CENTER OF ARLINGTON |
| 17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED | ED CAMPBELL - HUSBAND |
| 18. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code) | 3319 OAK RUN LN., MANSFIELD, TX 76063 |
| 19. METHOD OF DISPOSITION | ☐ Burial ☒ Cremation ☐ Donation ☐ Entombment ☐ Removal from state ☐ Other (Specify) |
| 20. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH | MICHAEL E. WADE ,BY ELECTRONIC SIGNATURE - 7652 |
| 21. | ☒ Unknown; Section ___ Block ___ Lot ___ Space ___ |
| 22. PLACE OF DISPOSITION (Name of cemetery, crematory, other place) | CREMATION SERVICES |
| 23. LOCATION (City/Town, and State) | FORT WORTH, TX |
| 24. NAME OF FUNERAL FACILITY | WADE FAMILY FUNERAL HOME |
| 25. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code) | 4140 W PIONEER PARKWAY, ARLINGTON, TX 76013 |
| 26. CERTIFIER (Check only one) | ☒ Certifying physician-To the best of my knowledge, death occurred due to the cause(s) and manner stated ☐ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred at the time date and place, and due to the cause(s) and manner stated. |
| 27. SIGNATURE OF CERTIFIER | MAAMOUN QAMAR , BY ELECTRONIC SIGNATURE |
| 28. DATE CERTIFIED (mm-dd-yyyy) | APRIL 21, 2016 |
| 29. LICENSE NUMBER | [redacted] |
| 30. TIME OF DEATH (Actual or presumed) | 07:30 AM |
| 31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City, State, Zip Code) | MAAMOUN QAMAR 3301 MATLOCK, ARLINGTON, TX 76015 |
| 32. TITLE OF CERTIFIER | MD |

WARNING: The penalty for knowingly making a false statement in this form can be 2-10 years in prison and a fine up to $10,000. (Health and Safety Code, Sec. 195.003)

**CAUSE OF DEATH**

33. PART 1. ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH.

| | Cause | Approximate interval Onset to death |
|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition ----> resulting in death) a. | METASTATIC OVARIAN CANCER WITH METS TO LUNG AND LIVER | MONTHS |
| Due to (or as a consequence of): b. | ABDOMINAL ABCESS | DAYS |
| Due to (or as a consequence of): c. | SEVER SEPSIS | DAYS |
| Due to (or as a consequence of): d. | | |

Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated, the events resulting in death) LAST

PART 2. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I.

34. WAS AN AUTOPSY PERFORMED? ☐ Yes ☒ No

35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ☐ Yes ☐ No

[redacted]

| Field | Entry |
|---|---|
| 36. MANNER OF DEATH | ☒ Natural ☐ Accident ☐ Suicide ☐ Homicide ☐ Pending Investigation ☐ Could not be determined |
| 37. DID TOBACCO USE CONTRIBUTE TO DEATH? | ☐ Yes ☒ No ☐ Probably ☐ Unknown |
| 38. IF FEMALE | ☒ Not pregnant within past year ☐ Pregnant at time of death ☐ Not pregnant, but pregnant within 42 days of death ☐ Not pregnant, but pregnant 43 days to one year before death ☐ Unknown if pregnant within the past year |
| 39. IF TRANSPORTATION INJURY, SPECIFY | ☐ Driver/Operator ☐ Passenger ☐ Pedestrian ☐ Other (Specify) |
| 40a. DATE OF INJURY (mm-dd-yyyy) | |
| 40b. TIME OF INJURY | |
| 40c. INJURY AT WORK? | ☐ Yes ☐ No |
| 40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area) | |
| 40e. LOCATION (Street and Number, City, State, Zip Code) | |
| 40f. COUNTY OF INJURY | |
| 41. DESCRIBE HOW INJURY OCCURRED | |
| 42a. REGISTRAR FILE NO. | [redacted] |
| 42b. DATE RECEIVED BY LOCAL REGISTRAR | APRIL 25, 2016 |
| 42c. REGISTRAR | REGISTRAR - CITY OF ARLINGTON, ELECTRONICALLY FILED |

VS-112 REV 1/2006

LHA

This is a true and correct reproduction of the original record as recorded in this office. Issued under authority of Section 191.051, Health and Safety Code.

ISSUED APR 25 2016

Geraldine R. Harris
GERALDINE R. HARRIS
STATE REGISTRAR

WARNING: THIS DOCUMENT HAS A DARK BLUE BORDER AND A COLORED BACKGROUND

THE STATE OF TEXAS

DEPARTMENT OF STATE HEALTH SERVICES VITAL STATISTICS

EXHIBIT C

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

Tarrant Appraisal District

**Tarrant Appraisal District Introduces New Online Homestead Application**

**New Improvements to Property Value Notices**

**In person Customer Service and ARB front counter hours have been extended from 7:30 AM to 5:30 PM through the end of May.**

# Account: 07591667

## Address: 3319 OAK RUN LN

Export Property Page

## Location




This map, content, and location of property is provided by Google Services.

EXHIBIT D

**Address:** 3319 OAK RUN LN
**City:** MANSFIELD
**Georeference:** 30694-1-10
**Subdivision:** OAK RUN ESTATES ADDITION
**Neighborhood Code:** 1M010G
**Latitude:** 32.6152736422
**Longitude:** -97.1477956491
**TAD Map:** 2108-344
**MAPSCO:** TAR-110S

# Property Data

**Legal Description:** OAK RUN ESTATES ADDITION Block 1 Lot 10
**Jurisdictions:**
CITY OF MANSFIELD (017)
TARRANT COUNTY (220)
TARRANT COUNTY HOSPITAL (224)
TARRANT COUNTY COLLEGE (225)
MANSFIELD ISD (908)
**State Code:** A
**Year Built:** 2003
**Personal Property Account:** N/A
**Agent:** None
**Site Number:** 07591667
**Site Name:** OAK RUN ESTATES ADDITION-1-10
**Site Class:** A1 - Residential - Single Family
**Parcels:** 1
**Approximate Size+++:** 3,341
**Percent Complete:** 100%
**Land Sqft*:** 13,939
**Land Acres*:** 0.3199
**Pool:** N
**Protest Deadline Date:** 5/15/2025

+++ Rounded.
* This represents one of a hierarchy of possible values ranked in the following order: Recorded, Computed, System, Calculated.

EXHIBIT D

# Property Documents

**Documents**

**2025 Documents**

No documents to display.

**2024 Documents**

Show Documents

# Owner Information

**Current Owner:**
DAVID WILL DELAFAYETTE

**Primary Owner Address:**
2102 BELMONT PARK DR
ARLINGTON, TX 76017

**Deed Date:**
**Deed Volume:**
**Deed Page:**
**Instrument:**

# $ Values

This information is intended for reference only and is subject to change. It may not accurately reflect the complete status of the account as actually carried in TAD's database. Tarrant County Tax Office Account Information.

**Year**
2025

**Improvement Market**
$465,573

**Land Market**
$112,000

EXHIBIT D

**Total Market**
$577,573
**Total Appraised+**
$577,573

---

**Year**
2024
**Improvement Market**
$465,573
**Land Market**
$112,000
**Total Market**
$577,573
**Total Appraised+**
$577,573

---

**Year**
2023
**Improvement Market**
$422,278
**Land Market**
$112,000
**Total Market**
$534,278
**Total Appraised+**
$534,278

---

**Year**
2022
**Improvement Market**
$299,534
**Land Market**
$96,000
**Total Market**
$395,534

EXHIBIT D

**Total Appraised+**

$395,534

**Year**

2021

**Improvement Market**

$387,651

**Land Market**

$49,500

**Total Market**

$437,151

**Total Appraised+**

$437,151

**Year**

2020

**Improvement Market**

$304,477

**Land Market**

$49,500

**Total Market**

$353,977

**Total Appraised+**

$353,977

Pending indicates that the property record has not yet been completed for the indicated tax year.

+ Appraised value may be less than market value due to state-mandated limitations of value increases.

## Exemptions / Special Appraisal

There are no exemptions for this property

EXHIBIT D

Per Texas Property Tax Code Section 25.027, this website does not include exemption information indicating that a property owner is 65 years of age or older for unauthorized individuals.

QUICK LINKS

Home
My Dashboard
Create Account

RESOURCES

Forms
Interactive Maps
Calendar
Taxpayer Liaison
Property Tax Assistance
News
Data Downloads
Rates
Reports
Public Information Act Request
Property Tax Transparency in Texas

ABOUT

Board of Directors
Tarrant Appraisal Review Board
Careers
Procurement
Quick Links
Take A Survey
Contact Us

## Contact

Tarrant Appraisal District
2500 Handley-Ederville Road
Fort Worth, Texas 76118-6909

(817) 284-0024

## Business Hours

Monday - Friday
8:00am - 5:00pm

EXHIBIT D

© 2025 Tarrant Appraisal District

EXHIBIT D